## Dlugas et ux. v. United Air Lines Transportation Corp. et al.

G. F. *Coffin, Jr.*, and *Fred B. Gernerd*, for plaintiffs.

*Butz, Steckel & Rupp*, for defendant, United Air Lines.

*Groman & Rapaport*, for defendant, Allentown Airport Corporation.

*Calvin E. Arner*, for defendant, City of Allentown.

HENNINGER, P. J., February 14, 1944.—This most interesting case arises out of the practice of large transport planes taking off very close to the edge of an airport and traveling at a very low altitude above a field of plaintiffs separated from the airport and the end of its runway by a narrow country road.

Plaintiffs also complain about other planes passing close to their house and farm buildings, but in that case the planes are operating over airport property and not

over that of plaintiffs. In the one case the complaint is that the planes are too close vertically; in the other, that they are too close horizontally or laterally.

Because of the fact that a preliminary injunction granted upon ex parte affidavits might cause irreparable damage to defendants, the chancellor granted a rule to show cause and held a hearing thereon. At the conclusion of the hearing, because of the novelty of the problem, the chancellor held the case under advisement. Thereafter argument was held and we are now asked to dispose of the rule.

For these purposes and without prejudice to the right of either party to offer testimony later in contradiction thereof, we find the following facts:

1. Frank Dlugos and Mary Dlugos, husband and wife, plaintiffs, are the owners of a farm of 26.686 acres of land in Hanover Township, Lehigh County, having acquired the same by deed from Allentown Airport Corporation in 1933.

2. The said farm is separated from an airfield now owned by the City of Allentown and leased by it to Allentown Airport Corporation by a 33-foot wide public road. The east-west runway of said airport is 3,875 feet long with its western terminus 100 feet from aforesaid public road.

3. The City of Allentown in 1941 condemned land of plaintiffs and others to obtain a 500-foot wide flight approach to a newly-constructed 100-foot wide northeast-southwest runway in the middle of said 500-foot flight approach. The northernmost line of said condemnation and of said flight approach is 40 feet from the corner of plaintiffs' house. The southwestern terminus of said runway is about 110 feet from the edge of aforesaid road.

4. The airport aforementioned, known as Allentown-Bethlehem Airport, is a licensed airport, used by Wilfred G. Post, operating as Lehigh Aircraft Company under contract with the Federal Government for the

training of naval air cadets, and by the Civilian Air Patrol. It has regularly scheduled transport service by United Air Lines and has periodic visits by private and military planes of all types, together with emergency landings by other planes.

5. Planes of United Air Lines frequently cross plaintiffs' open fields, which are opposite the east-west runway, at altitudes of 25 to 35 feet from the surface of the ground. This causes apprehension to workers in such fields and frightens plaintiffs' horses, which once ran away due to the noise and proximity of such planes. To date no actual physical damage has been done to plaintiffs or their property.

6. Regulations of the United States Civil Aeronautics Board and of the Division of Aeronautics of the Department of Revenue, Commonwealth of Pennsylvania, provide in substance: (1) The minimum safe altitude for flights in taking off or landing are those at which such flights may be made without being in dangerous proximity to persons or property on the land or water beneath, or unsafe to the aircraft; (2) the minimum altitude over settlements shall be not less than 1,000 feet; and (3) in other cases not less than 500 feet.

7. Safe practice calls for a minimum height of 100 feet at the edge of an airfield.

8. The height at which a runway must be approached before landing and the length of runway consumed before taking off depends upon many factors, such as gross plane weight, including load, together with the factors of velocity and direction of wind.

The discussion of our problem begins with the familiar principle that every land owner is entitled to ownership of the space above the surface of his land to the heavens as well as extending indefinitely below the surface thereof. This rule is now limited in Pennsylvania by sections 401 and 402 of The Aeronautical Code of May 25, 1933, P. L. 1001, 2 PS §§1467, 1468, which provides as follows:

"The ownership of the space over and above the lands and waters of this Commonwealth is declared to be vested in the owner of the surface beneath, but such ownership extends only so far as is necessary to the enjoyment of the use of the surface without interference, and is subject to the right of passage or flight of aircraft. Flight through the space over and above land or water, at a sufficient height, and without interference to the enjoyment and use of the land or water beneath, is not an actionable wrong, unless said flight results in actual damage to the land or water, or property thereon or therein, or use of the land or water beneath.

"Flight in aircraft over the lands and waters of this Commonwealth is lawful, unless at such low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water, is put by the owner, or unless so conducted as to be dangerous or damaging to persons or property lawfully on the land or water beneath. The landing of an aircraft on the lands or waters of another without his consent is unlawful, except in the case of a forced or emergency landing. For damage caused by a forced or emergency landing, the owner, lessee, and operator of the aircraft shall be liable, as provided in section four hundred three."

A study of The Aeronautical Code and the regulations promulgated thereunder, assuming their constitutionality, demonstrates that a land owner no longer has the absolute right to bar others from the air above the surface of his property. Instead there are reserved to him statutory rights to the air over his land expressed in relative terms: (a) "so far as is necessary to the enjoyment of the use of the surface without interference"; and (b) to prevent flights of aircraft "at such low altitude as to interfere with the then existing use to which the land . . . is put by the owner".

Plaintiffs' use of their land is for farming. Probably the greatest height achieved above the surface of the

land is that of a man standing on top of a loaded hay-wagon, a total of 15 to 20 feet at the most, and defendants ask us to find that that is the maximum distance heavenward to which plaintiffs can claim any property rights or protection.

Defendants' contention is too literal. The code is in derogation of the common law and was enacted prior to the effective date of the Statutory Construction Act of May 28, 1937, P. L. 1019, and therefore, it must be strictly construed. (See art. IV, sec. 58 (*g*) of said act, 46 PS §558.)

We gather then (1) that a land owner is still entitled to the enjoyment of the use of the surface without interference; (2) that no wrong on the part of airplanes is actionable unless accompanied by actual damage to either the land or property thereon or to the use of such land; and (3) that flight is unlawful at such low altitude as to interfere with the then existing use to which the land is put.

There is no need to belabor this subject. On the one hand the general principles are no longer in doubt and on the other hand there is no binding precedent or even any guide for their application. Plaintiffs are entitled to use their land for farming, their buildings as a home. Enjoyment of that use demands that airplanes shall keep at such an altitude and latitude as not to interfere with that use. The altitude must be such as not only to clear the heads of men and horses, but such as not to put them in fear. We must accept some compromise between the layman's exaggerated estimate of a plane's nearness and the aviator's feeling of confidence and control. We have perhaps a perfect analogy in our law of negligence in which one who acts upon a margin of safety measured by a micrometer and a stop watch, is charged with "testing a danger".

In fixing our figure of altitudinal margin, we do not claim for it any more than a reasonable guess. It can, however, be rationalized, if not justified. In Common-

wealth ex rel. v. VonBestecki et ux., 30 D. & C. 137, a tower 98 feet high with almost invisible guy wires, erected alongside an airport out of spite, was held a nuisance. If we understood him rightly, one of the respondents testified that 100 feet was considered the minimum margin for flight at the edge of a field. The governmental regulations, however, recognizing the danger to passengers and public, have fixed as a desirable margin 500 feet over open country and 1,000 feet over built up sections. While every plane landing and taking off must come to a start from scratch, it would seem that 100 feet altitude, excepting over airport property itself, is a fair margin to require, especially since one of the greatest hazards in aviation is at the point of take off and until the plane has achieved such altitude as to permit of unhampered manipulation.

Counsel for respondents call our attention to the principle that preliminary injunctions should be granted only in clear cases. The answer to that is that this is a clear case of the infringement of an absolute right. Both parties were heard and we are convinced that there is little exaggeration in plaintiffs' testimony. Furthermore, the remedy, if respondents have violated plaintiffs' rights, is open now as well as upon final decree for respondents to acquire the land necessary for the proper operation of an airport. Nor need we call respondents' attention to the fact that an appeal lies from our order: Nolan v. Farr et al., 294 Pa. 139. If the situation is as critical as plaintiffs declare, they cannot be asked to risk their lives and property pending final determination of this action.

On the question of plaintiffs' rights being affected by scientific progress, economic balances or the exigencies of war, it is sufficient to state: (1) The remedy of condemnation applies if plaintiffs' land is essential to scientific progress; (2) our Federal and State Governments have stated the rule above quoted fixing the relative rights of aviation and land owners to establish a

new balance economically; and (3) even in war a citizen's property must be compensated for if seized. Furthermore, that part of respondents' activities which refers to training of aviators for war work will not be affected by our injunction. To say that any decree of ours might endanger lives is to stamp the chancellor as an autocrat, holding the inviolability of his decree superior to human lives. We well know that, in an emergency, lives come first, decrees are secondary. But no one may establish a policy or practice which almost necessarily involves a violation of others' property rights.

A most interesting point in the case is the fact that plaintiffs purchased their land from the airport corporation after the airport was being operated. At most, this would prevent plaintiffs from having abated as a nuisance any lawful activities of the airport or any annoyance to themselves incidental to such operation. It does not prevent plaintiffs from protesting a continued trespass upon their premises by users of the airport, and this applies to trespassing planes as well as it would to trespassing spectators. The very sale of the plot shows that airport authorities never contemplated in 1933 that, within 10 years, planes would attain such weight as to require a longer runway in order to attain a safe altitude while still above property controlled by the airport. It is unfair, therefore, to charge a neighboring farmer with the foresight that was lacking in students of aviation.

We have made no decree relating to plaintiffs' claim that airplanes operated laterally too close to their home. The evidence in that respect was too vague and the nature of their rights not nearly so clear. A part of the flight approach is taken from their lands and compensation for that land should have taken care of the diminution in the value of their adjoining land and buildings due to the intended use of the condemned land as a flight approach.

The chancellor has made no findings based upon his personal observation, but has made such observations solely as a guard against flagrant exaggeration on the part of plaintiffs and their witnesses. While respondents stressed the possibility of error in calculating altitudes, they offered no testimony as to the actual height of planes over plaintiffs' lands.

Upon preliminary injunction, we find no relation between United Air Lines and either Allentown Airport Corporation or Lehigh Aircraft Company which would make the latter two defendants responsible for the trespasses we have found, although they may indirectly suffer through the enforcement of the decree. We have made the preliminary injunction effective as of April 1, 1944, to enable defendants to take such action as they may see fit to forestall any permanent curtailment of the airport's activities and because plaintiffs will probably not be using their fields before that time and, therefore, the delay will not harm them.